*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RONALD ANTHONY DIMAMBRO, JR.,

Defendant-Appellant.

UNPUBLISHED
September 29, 2022

No. 353363
Macomb Circuit Court
LC No. 2013-004215-FC

Before: CAVANAGH, P.J., and GARRETT and YATES, JJ.

PER CURIAM.

A jury convicted defendant, Ronald DiMambro, Jr., of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). The trial court imposed concurrent sentences of life imprisonment without parole for the murder conviction and 15 to 25 years' imprisonment for the child-abuse conviction. DiMambro argues that a prosecution medical expert's testimony impermissibly exceeded the scope of her expertise, that the trial court erred by denying his motion to remedy an alleged discovery violation, and that defense counsel was ineffective for failing to object to the trial court's jury instructions. Because each of these claims lacks merit, we affirm DiMambro's convictions.

## I. FACTUAL BACKGROUND

In August 2013, the two-year-old victim went into a coma and died less than a week later from blunt force head injuries. At trial, the prosecution's theory was that DiMambro was caring for the child while the child's mother, Nicole Randall, was at work, and was the only person who could have caused the child's fatal injuries.

DiMambro was previously tried and convicted of the same charges in June 2014. The trial court subsequently granted him a new trial, concluding in part that the prosecutor committed a

-1-

*Brady*[1] violation by failing to disclose several autopsy photographs before trial. In a prior appeal, this Court affirmed the trial court's decision to grant DiMambro a new trial.[2]

At DiMambro's second trial in January 2020, the prosecutor presented evidence that he and Randall were dating in 2013, and that they, along with Randall's two-year-old son, moved into the home of DiMambro's parents. DiMambro would watch the child while Randall worked. Randall testified that when she left for work on August 21, 2013, the child had no health or behavioral issues. DiMambro, however, testified that the child was less active that day and that his appetite was dramatically different. That afternoon, DiMambro put the child in his playpen and attended to some other matters in the house. When he returned and picked up the child, the child went limp and was struggling to breathe. DiMambro and his father called for emergency assistance. The child went into a coma and, despite surgical intervention, died from blunt force head injuries on August 27, 2013.

During the investigation, DiMambro offered alternative explanations of how the child could have been accidentally injured, including that he fell from a barstool and struck his head on the ceramic tile floor days before August 21, 2013. The prosecution's medical experts, Dr. Mary Lu Angelilli, a pediatrician at Children's Hospital of Michigan, and Dr. Daniel Spitz, the medical examiner who conducted the child's autopsy, both testified that the severity of the child's injuries would have had an immediate effect on his condition. They ruled out the accidental causes suggested by DiMambro, both because they were too remote in time and because they were inconsistent with the severity of the child's injuries. The experts also believed that violent shaking could have contributed to some of the injuries.

Dr. Angelilli concluded that the child died from nonaccidental trauma. Dr. Spitz believed that the child suffered brain trauma from an injury that occurred within seconds to no more than an hour before he began experiencing breathing problems and became unconscious. In Dr. Spitz's opinion, the injury was likely caused by striking the child against a door, wall, or something of substantial means; the injuries were also consistent with shaking the child for 20 to 30 seconds. DiMambro initially admitted in a police interview that he shook the child for up to 30 seconds, but he later reduced his time estimate to 10 seconds and claimed that it involved only gentle shaking. Dr. Spitz concluded that the cause of death was blunt force head injuries and the manner of death was homicide.

DiMambro's expert, Dr. Gregory Shoukimas, a radiologist, did not believe that the condition of the child's brain was consistent with blunt force trauma. He believed that the condition of the brain was caused by a deprivation of oxygen. Dr. Shoukimas testified that it was possible that the fall from the barstool caused small subdural hematomas that are known to be associated with seizures, and a seizure could have later caused an airway obstruction. According to Dr. Shoukimas, the child could have appeared normal for up to two weeks before the seizure

---

[1] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[2] *People v DiMambro*, 318 Mich App 204; 897 NW2d 233 (2016).

occurred. Another defense expert, Dr. Shaku Teas, a forensic pathologist, also believed that the barstool fall could not be ruled out as a cause of the child's injuries, and she believed that the child could have had a "lucid interval"[3] between the fall and when the symptoms became apparent. Dr. Teas reviewed Dr. Spitz's work and classified the cause of death as indeterminate, rather than as an accident or a homicide.

The jury found DiMambro guilty of first-degree felony murder and first-degree child abuse. The trial court sentenced him to life imprisonment without parole for the felony murder conviction and 15 to 25 years' imprisonment for the child-abuse conviction. DiMambro moved for a new trial or an evidentiary hearing, arguing that trial counsel was constitutionally ineffective for agreeing to an erroneous jury instruction on the elements of felony murder. The trial court denied the motion, concluding that the instructions, read as a whole, properly informed the jury that they needed to unanimously find that DiMambro knowingly or intentionally caused serious physical harm to the child that resulted in the child's death. DiMambro now appeals as of right.

## II. EXPERT TESTIMONY

DiMambro first argues that the trial court erred by overruling his objection to the scope of Dr. Angelilli's testimony. DiMambro contends that Dr. Angelilli was not qualified to testify about her interpretation of the child's CT scans because she was not trained as a radiologist.

## A. PRINCIPLES OF LAW

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013). A trial court abuses its discretion when its decision falls outside the range of reasonable outcomes. *Id*. at 722-723. Any preliminary questions of law, including questions involving the interpretation of rules of evidence, are reviewed de novo. *Id*. at 723. De novo review means that "we review the issues independently, with no required deference to the trial court." *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019).

The admissibility of expert testimony is governed by MRE 702:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

It follows from MRE 702 that "expert testimony must be limited to opinions falling within the scope of the witness's knowledge, skill, experience, training, or education." *People v Unger*, 278 Mich App 210, 251; 749 NW2d 272 (2008). "Consequently, an expert may not opine on matters

---

[3] Dr. Teas testified that a lucid interval is "a period of time that, after you sustain a head injury, you are more or less normal, and then something happens and you collapse."

outside his or her area of expertise." *Id*. And "[e]xpert testimony may be excluded when it is based on assumptions that do not comport with the established facts or when it is derived from unreliable and untrustworthy scientific data." *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007). Further, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." MRE 703. Thus, experts may rely on facts or data to support their opinion testimony, so long as this underlying information is admitted into evidence. See *id*. In sum, when considering whether to admit expert testimony, the trial court acts as a "gatekeeper" and "has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *People v Bynum*, 496 Mich 610, 624; 852 NW2d 570 (2014), citing *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 589; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

## B. ANALYSIS

The trial court found Dr. Angelilli qualified to testify as an expert in general pediatrics and child-abuse pediatrics. Dr. Angelilli testified that she was consulted regarding the child's condition while the child was being treated at Children's Hospital, and she concluded that the child suffered nonaccidental trauma. Dr. Angelilli physically examined the child, obtained his medical history, and reviewed the records related to his treatment. In explaining her findings, Dr. Angelilli referred to the child's medical records, which included the results of his CT scans that addressed his brain swelling. She determined that the brain injury was caused by trauma, in part, because the CT scan showed that there was unequal swelling on the two sides of the brain. Dr. Angelilli testified that she received information from a radiologist who looked at the child's CT scans and images, as well as information from other medical personnel at Children's Hospital. Following an overruled objection from defense counsel, Dr. Angelilli discussed the brain imaging conducted on the child. She testified that the scans "showed massive brain swelling" and explained that "how the patient looked and how he was behaving, and the depth of his coma, fit with what we were seeing on the scan."

On cross-examination, Dr. Angelilli explained how she relied on the radiologists to assist with her diagnosis:

> *Q*. . . . Now, when you were testifying today you testified that with the brain swelling you noticed that there was more swelling on the right side; is that correct?
>
> *A*. Yes. On the—it was shown on the CAT scan that there was more swelling on the right.
>
> *Q*. With respect to the CAT scan, it's fair to say that you are not a radiologist, correct?
>
> *A*. That's correct.
>
> *Q*. And when it comes to reading CAT scans, you rely on doctors who are radiologists and experts in reading those CAT scans, correct?
>
> *A*. Yes, that's correct.

Thus, Dr. Angelilli readily conceded that she relied on the interpretations of radiologists to support her opinion about greater swelling on the right side of the child's brain. Dr. Angelilli also testified that this difference in swelling on the sides of the brain was included in the radiology reports, which she incorporated into her consult notes; she also viewed the brain images with the radiologist. And later in her testimony, when Dr. Angelilli was asked to explain why she ruled out the barstool fall as a cause of the child's head injury, she testified, in part, that from what she "saw on this CAT scan with what [she] reviewed with [the] radiologist, with the neurosurgeon, with the trauma surgeon, with the critical care ICU doctor, he would have had to have symptoms immediately."

After Dr. Angelilli concluded her testimony, defense counsel placed on the record, outside the jury's presence, the prior objection to her testimony related to the CT scans:

> And, your Honor, during Dr. Angelilli's testimony, she began to testify about findings in the CT scan and, as she is not a radiologist and had to rely on what radiologists and other doctors told her, I object that she was not the right person to testify about the radiology findings, and that there was lack of foundation, and a lack—it was outside the expertise she was qualified to testify about.

The prosecutor responded:

> . . . *I remember indicating that all the records had been admitted into evidence. She's using the records as to help assist her form the basis of her opinion. In fact, she had indicated that as a consult she reviewed the records. She also spoke with and read the radiology films, she spoke with the treating physicians, she did a physical examination.* It wasn't just that. She used all her training and experience with all of the different information that she was able to gather as the consultant from all of the treating doctors, including the neurosurgeons as well in formulating her opinion. And it was our position that all of that together gave her sufficient training, experience and knowledge to rely on all of that information to render her opinion. [Emphasis added.]

The court noted that it agreed with the prosecutor, which is why it had overruled the defense's objection.

The trial court did not abuse its discretion by allowing Dr. Angelilli's testimony. DiMambro complains that Dr. Angelilli was not a radiologist, and therefore, she was not qualified to offer an opinion about the results of the child's CT scans and images. Contrary to what DiMambro argues, however, Dr. Angelilli did not offer her own interpretation of the CT scans and images, but admitted that she "rel[ies] on doctors who are radiologists and experts in reading those CAT scans." She explained that she incorporated the radiology report into her consult notes to show that she had reviewed the report. She also made it clear in her testimony that she was offering an opinion within her area of expertise, child-abuse pediatrics, which was based in part on findings made by radiologists regarding the child's CT scans and images. Dr. Angelilli was permitted to base her opinions on findings made by the radiologists involved in the child's care. See MRE 703. DiMambro has not shown that her testimony exceeded the scope of her expertise. Accordingly,

-5-

the trial court did not abuse its discretion by overruling DiMambro's objection to Dr. Angelilli's testimony.

### III. DISCOVERY VIOLATION

Next, DiMambro argues that the trial court erred by denying his motion to exclude Dr. Spitz's testimony, or grant a mistrial, because of Dr. Spitz's late-produced iron-staining test results.

### A. PRINCIPLES OF LAW

We review a trial court's ruling on the appropriate remedy for a discovery violation for an abuse of discretion. *People v Rose*, 289 Mich App 499, 524; 808 NW2d 301 (2010); MCR 6.201(J).

In criminal cases, discovery is limited to those items expressly set forth in MCR 6.201. MCR 6.201(A)(3) provides that, upon request, a party must provide "the curriculum vitae of an expert the party may call at trial and either a report by the expert or a written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion." MCR 6.201(A)(6) also provides that mandatory discovery includes "a description of and an opportunity to inspect any tangible physical evidence that the party may introduce at trial, including any document, photograph, or other paper, with copies to be provided on request." Under MCR 6.201(H), there is a continuing duty to advise the opposing party of any other information or material subject to disclosure.

MCR 6.201(J) authorizes a trial court to fashion an appropriate remedy for a discovery violation:

> If a party fails to comply with this rule, the court, in its discretion, may order the party to provide the discovery or permit the inspection of materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances. Parties are encouraged to bring questions of noncompliance before the court at the earliest opportunity. Willful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court.

"When determining the appropriate remedy for discovery violations, the trial court must balance the interests of the courts, the public, and the parties in light of all the relevant circumstances, including the reasons for noncompliance." *People v Banks*, 249 Mich App 247, 252; 642 NW2d 351 (2002). This inquiry includes consideration of whether the objecting party was prejudiced by the noncompliance with discovery rules. See *People v Davie (After Remand)*, 225 Mich App 592, 598; 571 NW2d 229 (1997).

### B. ANALYSIS

DiMambro's expert in forensic pathology, Dr. Teas, performed iron-staining testing to attempt to determine when the child's injuries occurred, which involved looking at tissue samples

under a microscope to determine whether the injuries were beginning to heal. On January 21, 2020, before the fifth day of trial, the prosecutor disclosed a supplementary summary of Dr. Spitz's proposed trial testimony that stated for the first time that Dr. Spitz would discuss the results of his own iron-staining analysis during his testimony. The next day, DiMambro filed an emergency motion to exclude this proposed testimony, or alternatively, to declare a mistrial. At the time, Dr. Spitz's testimony was scheduled for January 23, 2020, and Dr. Teas's testimony was scheduled for January 24, 2020. DiMambro argued that the late disclosure of this supplemental information made it impossible for his expert, Dr. Teas, to properly evaluate the new slides and prepare for trial. Specifically, Dr. Teas needed to "see the slides in person, be able to use her microscope to review them, and have adequate time to analyze them." DiMambro also argued that this last-minute evidence was an "intentional effort to provoke a mistrial"; thus, if the trial court was inclined to grant a mistrial, it should also bar the prosecution from retrial under the Double Jeopardy Clause.

The record reveals that the parties and the trial court had substantial discussions about the motion in chambers on January 22, 2020. Returning on the record, the prosecutor advised that Dr. Spitz had conducted his own iron-staining testing in response to the defense expert's reports and that Dr. Spitz was shipping all his slides to Dr. Teas overnight. The trial court denied DiMambro's motion without explaining its decision. At the same time, defense counsel confirmed on the record a new schedule for trial testimony: Dr. Spitz would testify on January 28 and Dr. Teas would testify on January 29. These dates had changed from the anticipated dates mentioned in DiMambro's written motion.[4]

The prosecution claims that the defense did not provide the images of the slides that Dr. Teas prepared in her own testing until shortly before trial. As a result, the prosecutor contacted Dr. Spitz, who immediately began reviewing Dr. Teas's slide images and conducted his own iron-staining analysis; the prosecution contends that "[a]s soon as the People received information regarding Dr. Spitz's staining, they provided [it] to the defense." Thus, the prosecution blames the mid-trial disclosure of Dr. Spitz's proposed iron-staining testimony on the defense's late disclosure of evidence. Although the record does not reveal when the parties actually exchanged their experts' work, Dr. Teas confirmed at trial that she was provided with Dr. Spitz's slides and looked at them the week before she testified.

Assuming without deciding that the prosecutor violated the rules of the discovery with its mid-trial disclosure of Dr. Spitz's iron-staining results and analysis, DiMambro has not shown that the late production affected his ability to review and respond to this evidence. Dr. Teas confirmed that she was provided with Dr. Spitz's slides and reviewed them before testifying. In fact, Dr.

---

[4] It is unclear from the record whether the trial court believed that the prosecution had violated rules of discovery and therefore ordered this schedule change as a remedy. In its brief on appeal, the prosecution states that "the trial court granted more time for the defense expert to review Dr. Spitz's slide photos." No matter the reason for this change, it was necessarily the trial court's decision to allow the delay, which provided Dr. Teas with additional time to review Dr. Spitz's materials.

Teas suggested that she disagreed with Dr. Spitz's conclusions about the iron staining on the scalp samples. The prosecutor also asked Dr. Teas about her review of Dr. Spitz's autopsy:

> *Q.* And [Dr. Spitz], in this case, he documented his work, correct?
>
> *A.* Yes.
>
> *Q.* He took photographs, correct?
>
> *A.* Yes.
>
> *Q.* He provided you with everything that you needed to conduct a review?
>
> *A.* Yes.
>
> *Q.* And, in fact, you were able to conduct that review?
>
> *A.* Yes.

Based on Dr. Teas's testimony, it appears that, just as DiMambro requested in his emergency motion, Dr. Teas "s[aw] the slides in person, [was] able to use her microscope to review them, and ha[d] adequate time to analyze them."[5] Under these circumstances, DiMambro has not established that the trial court abused its discretion by either declining to bar Dr. Spitz's iron-staining testimony or by denying DiMambro's motion for a mistrial. With the delay in Dr. Teas's scheduled testimony, Dr. Teas was afforded sufficient time to review Dr. Spitz's slides and analyze his work before her testimony. There is also no evidence to suggest that Dr. Teas would have testified differently if she had more time. Accordingly, the trial court's decision to deny DiMambro's motion to exclude part of Dr. Spitz's testimony, or for a mistrial, was not outside the range of reasonable and principled outcomes.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, DiMambro argues that trial counsel was ineffective for failing to object to the trial court's jury instructions on the elements of felony murder.

---

[5] DiMambro acknowledges that "[h]ad the prosecution disclosed such evidence before the start of trial, perhaps then, sending the slides to Dr. Teas to look at would have remedied the situation." But he asserts that the mid-trial disclosure of evidence "sandbagged" the defense and "resulted in the defense having to adjust its strategy and theory of defense in the middle of trial." DiMambro does not articulate how the defense strategy was altered, and it is unclear to us how this late disclosure of discovery changed the defense's theory that the child died as a result of a household accident.

## A. PRINCIPLES OF LAW

Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Any factual findings by the trial court are reviewed for clear error. *Id.* "A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake." *People v Kimble*, 252 Mich App 269, 272; 651 NW2d 798 (2002). Whether the facts as found by the trial court establish a violation of the defendant's right to the effective assistance of counsel is a question of constitutional law, which is reviewed de novo. *LeBlanc*, 465 Mich at 579. We also generally review claims of instructional error de novo to the extent that they involve questions of law. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006).

The Michigan and United States Constitutions require that criminal defendants receive the assistance of counsel in their defense. Const 1963, art 1, § 20; US Const Am VI. When reviewing an ineffective assistance of counsel claim, Michigan courts apply the two-pronged test adopted by the United States Supreme Court in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *People v Pickens*, 446 Mich 298, 309, 338; 521 NW2d 797 (1994). Under this test, a defendant must establish (1) that "counsel's performance fell below an objective standard of reasonableness" and (2) that "but for counsel's deficient performance, a different result would have been reasonably probable." *People v Armstrong*, 490 Mich 281, 290-291; 806 NW2d 676 (2011), citing *Strickland*, 466 US at 687-688, 694-696. For the performance prong, "a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). And to meet the prejudice standard in the trial context, the defendant must show a reasonable probability—that is, "a probability sufficient to undermine confidence in the outcome"—that the result of the trial would have been different had counsel not performed unreasonably. *Strickland*, 466 US at 694.

DiMambro's claim of ineffective assistance of counsel depends on a purportedly erroneous jury instruction. "A criminal defendant has a constitutional right to have a jury determine his or her guilt from its consideration of every essential element of the charged offense." *People v Kowalski*, 489 Mich 488, 501; 803 NW2d 200 (2011). Thus, "[j]ury instructions must include all the elements of the charged offense, and must not exclude material issues, defenses, or theories if the evidence supports them." *People v Kosik*, 303 Mich App 146, 155; 841 NW2d 906 (2013). When reviewing a claim of instructional error, "[w]e must consider the instructions as a whole, rather than piecemeal, to determine whether any error occurred." *Kowalski*, 489 Mich at 501. Thus, "an imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights." *Id.* at 501-502. Likewise, "[i]nstructional errors that omit an element of an offense, or otherwise misinform the jury of an offense's elements, do not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 501 (quotation marks and citation omitted).

B. ANALYSIS

The trial court instructed the jury on the elements of felony murder as follows:

The defendant is charged with first-degree felony murder. To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the defendant caused the death of [the child]; that is, [the child] died as a result of blunt force head injuries. Second, that the defendant had one of these three states of mind: He intended to kill, he intended to [d]o great bodily harm to [the child], or he knowingly created a very high risk of death or great bodily harm, knowing that death or such harm would be the likely result of his actions. Third, that when he did commit the act that caused the death of [the child], the defendant was committing or attempting to commit the crime of first-degree child abuse.

For the crime of first-degree child abuse, the prosecutor must prove each of the following elements beyond a reasonable doubt: First, that the defendant had care or custody of or authority over [the child] when the abuse allegedly happened, regardless of the length of time the child was cared for by, in the custody of, or subject to the authority of the defendant. Second, that the defendant either knowingly or intentionally caused serious physical harm to [the child]. By serious physical harm, I mean any physical injury to the child that seriously [i]mpairs that child's health or physical well-being, including but not limited to brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald or severe cut. And, third, that [the child] was under the age of 18 at the time.

DiMambro argues that trial counsel was ineffective for not objecting to these instructions.[6] In DiMambro's view, the trial court's felony-murder instruction was erroneous because the court did not follow the model instruction in M Crim JI 16.4. The model instruction provides that the first element of felony murder is that "the defendant caused the death of [*name deceased*], that is, that [*name deceased*] died as a result of [*state alleged act causing death*]." The prosecution's theory at trial was that the child died from a blunt force head injury inflicted by DiMambro. Consistent with that theory, the trial court instructed the jury that, to find DiMambro guilty of felony murder, it had to find that "the defendant caused the death of [the child]; that is, [the child] died as a result of blunt force head injuries." DiMambro correctly notes that "blunt force head

---

[6] Trial counsel affirmatively approved these jury instructions, and thus any underlying claim of instructional error is waived. See *Kowalski*, 489 Mich at 504 ("[B]y expressly . . . approving the jury instructions on the record, defendant waived any objection to the erroneous instructions, and there is no error to review."). Despite this waiver, we independently review DiMambro's ineffective assistance of counsel claim relating to the failure to object to these instructions. See *People v Traver*, 502 Mich 23, 43 n 10; 917 NW2d 260 (2018).

injuries" is not a specific act causing death, but rather is the type of injury alleged to have caused the child's death. In other words, a blunt force head injury can be inflicted or accidental.

Yet it is clear, reading the instructions in their entirety, that the trial court instructed the jury that it had to find that *DiMambro caused the child's blunt force head injuries*, which was the act that caused the child's death. The jury was instructed that it had to find that, when DiMambro committed the acts that caused the child's death, he was "committing or attempting to commit the crime of first-degree child abuse." The trial court read the jury the elements of first-degree child abuse, which included finding "that the defendant either knowingly or intentionally caused serious physical harm to [the child]." Thus, reading the felony-murder instructions as a whole, the jury knew that it needed to find that DiMambro committed an act that caused a blunt force head injury, with the identified states of mind, and that he committed or attempted to commit first-degree child abuse, in which he knowingly or intentionally caused serious physical harm to the child. Accordingly, even if counsel erred by not objecting, reversal is not required because the instructions as a whole "fairly presented the issues to be tried and adequately protected the defendant's rights." *Kowalski*, 489 Mich at 502. Therefore, DiMambro cannot show that he was prejudiced by counsel's failure to object.

DiMambro also contends that trial counsel was ineffective for failing to request a specific unanimity instruction. That is, in DiMambro's view, he was entitled to an instruction that the jury had to unanimously agree on the same *specific act* supporting the felony murder charge.

Under the Sixth Amendment, incorporated against the States under the Fourteenth Amendment, the right to a jury trial requires a unanimous verdict. *Ramos v Louisiana*, ___ US ___; 140 S Ct 1390, 1397; 206 L Ed 2d 583 (2020). No one disputes this general unanimity requirement that, to convict, all jurors must find a defendant guilty beyond a reasonable doubt. Instead, DiMambro objects to the lack of a specific unanimity instruction; he claims entitlement to a "special instruction that the jury must unanimously agree on the same specific act that provided the factual basis of their verdict."

In *People v Cooks*, 446 Mich 503, 512-513; 521 NW2d 275 (1994), our Supreme Court discussed when a specific unanimity instruction is required:

> . . . [A] specific unanimity instruction is not required in all cases in which more than one act is presented as evidence of the actus reus of a single criminal offense. The critical inquiry is whether either party has presented evidence that materially distinguishes any of the alleged multiple acts from the others. In other words, where materially identical evidence is presented with respect to each act, and there is no juror confusion, a general unanimity instruction will suffice.

The *Cooks* Court elaborated:

> . . . [I]f alternative acts allegedly committed by defendant are presented by the state as evidence of the actus reus element of the charged offense, a general instruction to the jury that its decision must be unanimous will be adequate unless 1) the alternative acts are materially distinct (where the acts themselves are conceptually distinct or where either party has offered materially distinct proofs regarding one

-11-

of the alternatives), or 2) there is reason to believe the jurors might be confused or disagree about the factual basis of defendant's guilt. [*Id*. at 524.]

Here, the trial court did not need to instruct the jury that it had to unanimously agree on a specific act supporting the charge of felony murder. Although DiMambro offered alternative explanations for how the child might have been injured accidentally, the prosecution's theory at trial was that the child's death was not accidental and that none of DiMambro's explanations were consistent with the evidence. While the prosecution did not know exactly how the child was injured, it argued that DiMambro, the only person caring for the child when he could have been injured, caused the blunt force head injury that led to the child's death. The prosecution did not offer materially distinct proofs of different criminal acts or injuries that caused the child's death. Thus, any request or objection that defense counsel made would have been futile because the trial court was not required to give a specific unanimity instruction. And defense counsel cannot be ineffective for failing to make a futile request. See *Unger*, 278 Mich App at 256. Accordingly, defense counsel was not ineffective for failing to request a specific unanimity instruction.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kristina Robinson Garrett
/s/ Christopher P. Yates